UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
DR. VARLETON McDONALD,

                            Plaintiff,

    -against-

HEMPSTEAD UNION FREE SCHOOL
DISTRICT, BOARD OF EDUCATION OF
THE HEMPSTEAD SCHOOL DISTRICT,
DAVID B. GATES, Individually and in his
official capacity, RANDY STITH, Individually
and in his official capacity, and LAMONT E.
JOHNSON, Individually and in his official
capacity,

                          Defendants.
-----------------------------------------------------X

**MEMORANDUM & ORDER**

18-CV-5658 (DRH)(SIL)

**APPEARANCES:**

**For Plaintiff**
Law Office of Mark E. Goidell
666 Old Country Road, Suite 700
Garden City, New York 11530
By:    Mark E. Goidell, Esq.

**For Defendants:**
The Scher Law Firm, LLP
One Old Country Road, Suite 385
Carle Place, New York 11514
By:    Austin Graff, Esq.

**HURLEY, Senior District Judge:**

       Plaintiff Dr. Varleton McDonald ("Plaintiff" or "McDonald") commenced this

action pursuant to 42 U.S.C. § 1983 seeking "injunctive and monetary relief" for

alleged violations of Plaintiff's rights under the First and Fourteenth Amendments

of the United States Constitution, and for New York State statutory retaliation claims against defendants Hempstead Union Free School District (the "District"), the Board of Education of the District (the "Board"), and Board members David B. Gates ("Gates"), Randy Stith ("Stith") and Lamont E. Johnson ("Johnson") (collectively "Individual Defendants")(the District, Board, and Individual Defendants are collectively referred to as "Defendants"). (Complaint ¶ 1.) Presently before the Court is Defendants' motion to dismiss the Complaint. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

The following factual allegations are taken from the Complaint ("Compl.") and presumed true for purposes of this motion.

In June 2017, Dr. Shimon Waronker ("Waronker") was hired by the District as the new Superintendent. Upon the recommendation of Waronker, who had worked with Plaintiff in schools throughout New York City, Plaintiff was hired as Deputy Superintendent on or about November 6, 2017.

As Deputy Superintendent, Plaintiff's responsibilities included the follows:

supervise assigned assistant superintendents and chief information officer; review and interpret all laws, regulations, statutes, rules and policies affecting the school division; respond to inquiries for interpretation from division staff on matters not clearly covered by regulation, policy or legislation; annually evaluate assigned assistant superintendents, chief information officer and principals for job effectiveness; oversee administration of the fiscal and human resources of assigned departments; review evaluations submitted by assigned assistant superintendents and chief information officer on personnel under their supervision; oversee, implement and evaluate a strategic plan; assist in the preparation and administration of budget from assigned departments; assist in the determination of types of programs

needed by the school division and make recommendations; support the Superintendent in the review and revision of operational goals and objectives and efforts to measure progress toward their attainment; prepare and provide workshop presentations for the Board; establish and maintain effective working relationships with community and state agencies, area businesses, industries and other organizations; organize and/or chair various committees as directed; explain and interpret programs to staff, parents and the general public; collaborate and work cooperatively with advisory boards; and respond to parent and community concerns.

(Compl.¶ 19.) His duties did not include, however, "the determination of policy or investigations into corruption, abuses and mismanagement." (*Id.* ¶ 20.) Special investigators and a forensic auditing firm were brought in to root out corruption and mismanagement. (*Id.* ¶ 21.)

Waronker and Plaintiff undertook extensive reviews to curb violence in the District's schools, implemented new security plans, and created new and improved attendance and discipline policies (*Id.* ¶¶ 22-25.) They also undertook a number of other reviews. During their review of student transcripts to determine graduation needs for students, they discovered pervasive academic and financial fraud, including falsification of student population and graduation rates. During the review of facilities, they found, among other things, crumbling, mold-infested trailers, unmaintained and decaying boilers, and vermin infestation. Plaintiff also became aware "of other gross financial improprieties," including the District's head of food services utilizing District equipment and facilities for a catering business. Plaintiff advised the New York State Deputy Commissioner of Education about the foregoing findings. He also advised the District administrators and Board members

of these findings as well as his conference with the Deputy Commissioner. (*Id.* ¶¶ 31-35, 38.)

In December 2017, the FBI contacted Plaintiff and requested a meeting regarding some of the practices and policies of the District. Plaintiff met with the FBI and told investigators about many of the findings referenced above. He then told District administrative staff and the Board President about the FBI meeting and Waronker sent a district wide email in December 2017 regarding the investigation. (*Id.* ¶¶ 36-37.)

The forensic accounting audit of the District's financial practice ordered by Waronker revealed the following: 295 payroll distributions in 2017-18 to 129 individuals who were not active employees of the District; 500 employees who were paid as vendors during fiscal years 2013-17; and millions of dollars to a "nominal tutoring service," which was owned and operated by an individual who is the domestic partner of Board member Johnson, on "fraudulent and/or inflated invoices, frequently for phantom services." (*Id.* ¶¶39-40.)

On November 27, 2017 Johnson, who had been removed as a Board member and trustee, was restored to the Board. As a result the Board majority changed, "curtailing the ability of Plaintiff and Dr. Waronker to implement change." "Among other things, the Board thereupon fired the [s]pecial investigators, who were investigating abuse, mismanagement and possible corruption, and fired the [m]aster [t]eachers, who were hired to improve the quality of teaching throughout the District." On January 19, 2018, the Board placed Waronker on "Administrative

Leave of Absence with Pay" and appointed Regina Armstrong ("Armstrong") as interim superintendent. (*Id.* ¶¶ 41-43.)

In early January 2018, Plaintiff received a copy of the preliminary report of the forensic study. He provided a copy to Armstrong and discussed the preliminary report with her and "District Administration." Within days thereafter, on January 17, 2018, he was terminated. (*Id.* ¶¶ 44-45.)

Based on the foregoing, Plaintiff asserts that his firing violated his First Amendment rights to free speech and freedom of association as it was (1) in retaliation for "communicat[ing] the finding of corruption and mismanagement . . . to the FBI, New York State Commissioner of Education, District administration and Board members" and (2) motivated by his association with Waronker. He also asserts state law whistleblower claims pursuant to N.Y Civil Serv. Law § 75-b and N.Y. Educ. Law § 3028-d.

## DISCUSSION

## I. Standard of Review: Fed. R. Civ. P. 12(b)(6) Motion to Dismiss

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action, a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). The plausibility standard is guided by two principles. *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *accord Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009).

First, the principle that a court must accept all allegations as true is inapplicable to legal conclusions. Thus, "threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679. A plaintiff must provide facts sufficient to allow each named defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery. *See Twombly*, 550 U.S. at 555.

Second, only complaints that state a "plausible claim for relief" can survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that defendant acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line' between possibility and plausibility of 'entitlement to relief.' " *Id*. at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal citations omitted); *see In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). Determining whether a complaint plausibly states a claim for relief is "a context specific task that requires the reviewing court to draw

on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *accord Harris*, 572 F.3d at 72.

"In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" *Leonard F. v. Israel Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999) (quoting *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)); *see Weiss v. Village of Sag Harbor*, 762 F. Supp. 560, 567 (E.D.N.Y. 2011) (in deciding a motion to dismiss a court is entitled to consider, inter alia, "documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference" and "documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint"). A document may be considered on a motion to dismiss where the plaintiff has "reli[ed] on the terms and effect of [the] document in drafting the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis omitted). Such reliance "is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id.*; *see Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (integral documents may include documents partially quoted in complaint or on which plaintiff relied in drafting complaint). "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the

complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "This generally occurs when the material considered is a 'contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint.' " *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) (quoting *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006)).

## II. Consideration of Materials Outside the Complaint

Preliminarily, the Court must determine what materials "outside" the Complaint it may properly consider on this motion. In support of its motion to dismiss, Defendants offer the following document: (1) January 17, 2018 Minutes of the Board; (2) Plaintiff's November 8, 2018 letter in opposition to Defendants' pre-motion conference request; (3) the transcript of Plaintiff's 50-h hearing; (4) a December 6, 2017 email from then Superintendent Waronker; (5) Waronker's January 5, 2018 open letter to the community; (6) a decision of the Commissioner of Education in the appeal of Lamont E. Johnson regarding his removal from office. Plaintiff offers Waronker's January 5 open letter and another letter from Waronker addressed to the "Hempstead Family" and introducing Plaintiff as the new Deputy Superintendent.

Turning first to the documents submitted by Defendants, it is worthy of note that in their opening memorandum they do not even purport to address the

propriety of considering them on a motion to dismiss leaving this Court to guess as their import. As discussed below, a number of them are not properly considered and/or are irrelevant to a determination of whether Plaintiff's allegations pass muster under Fed. R. Civ. P. 12(b)(6).

As to the reliance on Plaintiff's 50-h testimony, as another judge in this District recently observed, the "weight of authority in the Second Circuit" excludes 50-h hearing testimony from consideration on a motion to dismiss. *Serrata v. Givens*, 2019 WL 1597297, at * 3 (E.D.N.Y. Apr. 15, 2019) ( citing *Doe v. City of New York*, , 2018 WL 3824133, at *5 (E.D.N.Y. Aug. 9, 2018) ("[T]he greater weight of authority in this circuit excludes 50-h hearing testimony from consideration on a motion to dismiss unless there is evidence that the plaintiff relied on the 50-h hearing testimony in drafting [his] complaint."); *Prevost v. City of New York,* 2014 WL 6907560, at *2 (S.D.N.Y. Dec. 9, 2014) ("District courts in this circuit regularly decline to consider 50-h transcripts submitted in support of or in opposition to a motion to dismiss, even if neither party objects."); *Nielsen v. City of Rochester*, 58 F. Supp. 3d 268, 273 (W.D.N.Y. 2014) ("Generally speaking, a transcript from a 50-h hearing will be considered outside the four corners of the complaint."); *Fontanez v. Skepple*, 2013 WL 842600, at *3 (S.D.N.Y. Mar. 6, 2013) ("In cases similar to the present one, courts have found that it is not appropriate to consider 50-h testimony in ruling on a Rule 12(b)(6) motion."), *aff'd*, 563 F. App'x 847 (2d Cir. 2014). The 50-h transcript shall not be considered.

The January 17, 2018 minutes are apparently submitted in view of the allegation that Plaintiff was terminated by the Board on January 17, 2018. Based on Defendants' Memorandum it appears to be Defendants' position that the minutes should be considered because they demonstrate that it is the motive of the Individual Defendants that is at issue, as they are the Board members who voted for Plaintiff's termination. (*See* Defs.' Mem. at 8.) As that argument goes to the merits, consideration of the minutes is not appropriate on a motion addressed to a pleading. Similarly, the December 6 email, the January 5 letter to the Community and Plaintiff's pre-motion conference opposition are all referenced in Defendants' argument challenging the veracity of allegations in the Complaint and therefore will not be considered.[1] Finally, the decision of the Commissioner of Education restoring Johnson is referenced in the Complaint and thus will be considered, but only to establish the fact of such litigation but not for the truth of the matters asserted therein. *Cf. Int'l Star Yacht Racing Ass'n v. Tomy Hilfeger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1988) (Courts may take judicial notice "of a document filed in another court not for the truth of the matters asserted in the other litigation but rather to establish the fact of such litigation and related filings.") (internal quotation marks omitted).

As for the documents submitted by Plaintiff, the January letter has already been addressed. The letter from Waronker introducing Plaintiff to the Hempstead

---

[1] The Court also notes that the complaint references an email sent by Waronker in December without specifying the date thereof and therefore it is cannot be determined whether the referenced email is the one submitted by Defendants.

community appears to be submitted to bolster the merits of Plaintiff's associational claim and will not be considered.

## III.    First Amendment Free Speech Retaliation Claim

In order to establish a First Amendment retaliation claim, an employee must prove that: "(1) [he] engaged in constitutionally protected speech . . .; (2) [he] suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment decision." *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006), *overruled on other grounds*, *Appel v. Spiridon*, 531 F.3d 138, 139 (2d Cir. 2008). "Although a public employee 'does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment,' these rights are not absolute, because the public employer has a legitimate interest in regulating the speech of its employees to promote the efficiency of its public services. *Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003) (citing *Connick v. Myers*, 461 U.S. 138, 140 (1983)); *see also Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) ("A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."); *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968)); *Ruotolo*, 514 F.3d at 189 ("Recognizing that government employers (like private employers) have heightened interests in controlling speech made by an employee in his or her professional capacity, the Supreme Court ruled that a public employee speaking in his official capacity is not speaking as a citizen for First Amendment purposes, and

employer retaliation for such speech does not justify the 'displacement of managerial discretion by judicial supervision.'" *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008) (internal quotation marks omitted).

"When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). However, there are times when a public employee's speech falls within the ambit of the First Amendment. To determine whether a public employee's speech is protected, courts conduct a two-step inquiry. *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015). First, the court "determin[es] whether the employee spoke as a citizen on a matter of public concern. *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). "This step one inquiry in turn encompasses two separate subquestions: '(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee.'" *Id.* (quoting *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir.2011)). An employee speaks as a citizen if the speech fell outside of the employee's official responsibilities, and a civilian analogue existed. *Matthews*, 779 F.3d at 172 (citing *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203–04 (2d Cir. 2010)). Speech is on a matter of public concern and therefore a protected activity "if it relates 'to any matter of political, social, or other concern to the community.'" *Dillon v. Suffolk Cnty Dept. of Health Servs.*, 917 F.Supp.2d 196, 205 (E.D.N.Y. 2013)(citing *Connick v. Myers*, 461 U.S. 138, 146, 103

S.Ct. 1684, 75 L.Ed.2d 708 (1983)). If the answer to either subpart is no, the inquiry

ends. "If, however, both questions are answered in the affirmative, the court then

proceeds to the second step of the inquiry, commonly referred to as the *Pickering*

analysis: whether the relevant government entity 'had an adequate justification for

treating the employee differently from any other member of the public based on the

government's needs as an employer.'" *Matthews,* 779 F.3d 167 (quoting *Lane v.*

*Franks*, 573 U.S. 228, 134 S. Ct. 2369, 2380 (2014)).

Defendants concede that "matters concerning unlawful conduct within the

School District plainly implicate a matter of public interest that affords First

Amendment protection." (Defs.' Mem. in Supp. at 4 (quoting *Ramirez v. Hempstead*

*Union Free Sch. Distr. Bd. of Educ.*, 33 F. Supp.3d 158, 173 (E.D.N.Y. 2015)). They

also concede, for purposes of this motion only, that Plaintiff's communications to the

FBI and the Commissioner of Education was protected speech. (Def.'s Mem. in

Supp. at 7.) Their argument is addressed to (1) whether Plaintiff was speaking as a

private citizen or as a public employee vis a vis his communications to the District's

administrators and Board members; and (2) whether a causal connection exists

between Plaintiff's speech such that the speech was a motivating factor in his

termination. (Def.'s Mem. in Supp. at 5-11.) It is to these issues that the Court now

turns.

### A.    Whether Plaintiff was Speaking as a Citizen in his Communications to District Administration and the Board

The Second Circuit has held that speech can be "pursuant to" a public

employee's official job duties even though it is not required by, or included in, the

employee's job description, or in response to a request by the employer speech."
*Weintraub v. Board of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 203 (2d
Cir. 2010); *see Garcetti*, 547 U.S. 424-25 ("Formal job descriptions often bear little
resemblance to the duties an employee actually is expected to perform, and the
listing of a given task in an employee's written job description is neither necessary
nor sufficient to demonstrate that conducting the task is within the scope of the
employee's [professional duties for First Amendment purposes."). Speech is not
protected if it is "part-and-parcel of [the employee's] concerns about his ability to
properly execute his duties." *Id.* (internal quotation marks omitted). Moreover, "the
existence of a civilian analog is not dispositive of whether a public employee spoke
as a private citizen, but it is merely a factor that the court could consider as part of
the inquiry into whether the public employee's speech was made pursuant to his
ordinary employment related responsibilities." *Montero v. City of Yonkers, New
York*, 890 F.3d 386 (2d Cir. 2018).

Here, according to the Complaint, Plaintiff's duties included, among other
things, "review[ing] and interpret[ing] all laws, regulations, statutes, rules and
policies affecting the school division;" "oversee[ing the] administration of the fiscal
and human resources of assigned departments;" "oversee[ing], implement[ing] and
evaluat[ing] a strategic plan;" "assist[ing] in the determination of types of programs
needed by the school division and make recommendations;" and "support[ing] the
Superintendent in the review and revision of operational goals and objectives and
efforts to measure progress toward their attainment." (Comp. ¶ 19.) Measured

against these duties, his alleged speech is intimately tied to his ability to perform his duties. For example, his speech regarding attempting to implement a violence suppression and security plan for the high school, his attempt to create and effectuate new and improved policies to replace the outdated and ineffective policies regarding attendance and discipline, and improprieties regarding student classification, grading, grade promotion, graduation rates and payments to staff and vendors (Compl., ¶ 23-25, 29, 44-45) are all tied, at the very least to his responsibilities for "review[ing] and interpret[ing] all laws, regulations, statutes, rules and policies affecting the school division;" and "assist[ing] in the determination of types of programs needed by the school division and make recommendations." In other words, while his duties may not have included "investigations into corruption, abuses and mismanagement," to the extent such corruption, abuses and mismanagement were uncovered, they affected his ability to do his job. Hence, his speech regarding these items to the Board and Administration was as an employee, not a citizen, and is not protected. *See Weintraub v. Bd. of Educ. of the City School Dist. of the City of New York,* 593 F.3d 196, 204–05 (2d Cir.2010) (that teacher did not communicate with "public" about incident supported that he was speaking as an employee not a citizen); s*ee generally Williams v. Dallas Ind. School Dist.,* 480 F.3d 689, 692 (5th Cir. 2007) ("Even if the speech is of great social importance, it is not protected by the First Amendment so long as it was made pursuant to the [public] worker's official duties.").

Accordingly, to the extent Plaintiff's retaliation claim is based on his communications to the Board and District administrators regarding items of mismanagement, corruption, and malfeasance, they are dismissed.

**B.    Whether a Causal Connection Exists Between Plaintiff Speech to the FBI and the Commissioner of Education and His Termination**

As noted earlier, Defendants concede, for purposes of this motion, that Plaintiff's speech to the FBI and the Commissioner of Education is protected speech as made by a citizen on a matter of public concern. In support of the dismissal of these claims, Defendants maintain there is no plausible causal connection between that speech and his termination by the Board. According to Defendants, the allegations in the complaint regarding to whom he disclosed his communications with the FBI and the Commissioner of Education are "generalized to the District's administration and Board members, without identifying the Board members whose identities matter" and Plaintiff admitted in his 50-h testimony that he did not tell the Individual Defendants, "the actual decision makers." (Defs.' Mem at 9-10.) Defendants' argument is unavailing.

According to the Complaint, the Plaintiff alleges that he (1)"told District administrative staff and the Board President about the FBI meeting and the concerns expressed by FBI investigators soon after his meeting with the FBI" and "a district-wide email was sent in December 2017 by Waronker regarding the FBI investigation" and (2) "discussed the conference with the Deputy Commissioner . . . with District administration and Board members."

Notwithstanding Defendants' assertions to the contrary, these allegations are sufficient to plausibly allege knowledge by Defendants of the referenced conversations and support a causal connection. "Causation can be proven [inter alia] . . . indirectly . . . by showing that the protected activity was followed closely by discriminatory treatment . . . ." *D'Andrea v. Nielsen*, -- F. Appx. --, 2019 WL 1503923, * 2 (2d Cir. April 5, 2019) (quoting *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000)). The time frame involved here - the relevant discussion with the FBI and the Commissioner taking place in December 2017 and Plaintiff's firing on Janaury 18, 2018 – is enough to support a plausible inference of causation. *See Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980) (eight month gap between EEOC complaint and retaliatory act suggested causal relationship); *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (inferring causal connection with six-month lapse); *Gorman–Bakos*, 252 F.3d at 554 (same with five month lapse); *see also Cioffi v. Averill Park Central School Dist. Bd of Ed.*, 444 F.3d 158, 168 (2d Cir. 2006) (little over three months is not "too long for any inference of retaliatory motive and causation to be drawn").

Defendants' argument in support of the lack of causation is based primarily on documents which are not properly considered on a motion to dismiss – viz., Plaintiff's 50-h testimony and a December 6 email – which they use to contradict the allegations in the complaint. To ultimately succeed on his claim, Plaintiff will have to demonstrate that the decisionmakers were aware of the protected speech. *See Tucker v. New York City*, 376 Fed. Appx. 100, 104 (2d Cir.2010) (affirming

summary judgment on the plaintiff's First Amendment retaliation claim where he "[did] not show that hiring decisionmakers were aware of his only conceivably protected speech"). However, at the pleading stage, he need only plead a plausible claim of such knowledge. The allegations that Plaintiff told the "Board President" and "board members" are sufficient to withstand a motion to dismiss. Even if Plaintiff did not himself inform the Individual Defendants about these matters, it is certainly plausible that the members of the Board and administration with whom he shared this information would, in turn, share it with the other members of the Board as within the purview of their responsibilities.

Defendants' motion to dismiss the First Amendment free speech retaliation claim to the extent it is premised on Plaintiff's communications to the Board regarding his sessions with the FBI and the Commissioner of Education is denied.

## IV. First Amendment Freedom of Association Retaliation Claim

Defendants assert two arguments in support of their motion to dismiss Plaintiff's Freedom of Association claim: first, that his association with Waronker is not the type of relationship protected by the First Amendment; and second, that the claim is duplicative of his free speech claim.

As alleged in the complaint, Plaintiff and Waronker had worked together previously and it was on Waronker's recommendation that Plaintiff was hired by the District. Together they "engaged in extensive association with each other in an attempt to reform the district and bring much needed change to the students and

population of the District , and in opposing the [described] practices and policies of the District." (Comp. ¶¶ 17-18, 56.)

The Supreme Court has recognized a right of association with two distinct components—an individual's right to associate with others in intimate relationships and a right to associate with others for purposes of engaging in activities traditionally protected by the First Amendment, such as speech and other expressive conduct. *Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984)).

"Although freedom of expressive 'association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition.'" *Piscottano v. Murphy*, 511 F.3d 247, 268 (2d Cir. 2007) (quoting *Healy v. James*, 408 U.S. 169, 181 (1972)). As it is grounded in those explicitly guaranteed freedoms, the threshold question for a public employee's claim of freedom of expressive association is patterned after the threshold question for a free speech retaliation claim: whether the employee's expressive conduct is as a citizen on a matter of public concern. *Id.* at 268, 271; *see Adler v. Pataki*, 185 F.3d35, 44 (2d Cir. 1999) (applying First Amendment retaliation standard to claim of intimate association).

While the topic of the expressive conduct at issue here may be fairly categorized as one of public concern, it is not that of a citizen and therefore the claim fails. The actions undertaken were part and parcel of McDonald and Waronker's "official" employment responsibilities. *See Weintraub*, 593 F.3d 203-04.

Indeed, as described by Plaintiff, he and Waronker "joined together in communicative conduct on behalf of the District, its students and its families." (Pl.'s Mem. at 19-20; *see also, e.g.,* Compl at ¶¶ 22-24 (alleging Plaintiff became aware of problem plaguing the District and he attempted to implement Waronker's initiatives, attempted to implement a violence suppression and security plan, and attempted to create and effectuate new and improved policies); *id.* at ¶34 (asserting that plaintiff and Waronker "encountered substantial resistance to the implementation of new programs and initiatives, which would have disrupted the long-entrenched patronage, nepotism, and corruption plaguing the District").)

The cases relied upon by Plaintiff support this result as in each case it was activities outside the employment duties of the plaintiff, i.e. activities as citizens, that formed the premise for the associational claim. For example, in *Piscottano v. Murphy*, 511 F.3d 247 (2d Cir. 2007) it was the corrections officers' association with the Outlaws Motorcycle Club, and in *Meltzer v. Bd. of Educ. of City Sch. Dist. of the City of N.Y.*, 336 F.3d 185, 192 (2d Cir. 2003) it was the teacher's membership in the North American Man/Boy Love Association. *Cf. U.S. v. Nat'l Treasury Employees Union*, 513 U.S. 454, 467 (1995) (expressive activities of executive branch employee who challenged prohibition on receipt of honoraria by government employees were made outside workplace and involved content largely unrelated to government employment).

The motion to dismiss the freedom of association claim is granted.[2]

## V.    The State Law Whistleblower Causes of Action

Defendants seeks dismissal of the State Whistleblower causes of action on the grounds that Plaintiff has not plausibly pled a causal connection between the disclosure and the adverse employment action given the lack of a plausibly allegation that "the decisionmakers, the individual defendants," had knowledge of his disclosure of information and because his 50-h testimony supports the lack of knowledge on their part. (Defs.' Mem. at 14-17.)

Firstly, the complaint does plausibly allege knowledge on the part of Defendants. It is alleged that

> Dr. McDonald told District administrative staff and the Board President about the FBI meeting and the concerns expressed by FBI investigators soon after his meeting with the FBI. Additionally, a district-wide email was sent in December 2017 by Dr. Waronker regarding the FBI investigation.
> Dr. McDonald also told the New York State Deputy Commissioner of Education about the findings set forth above during a video conference in December 2017, and discussed the conference with the Deputy Commissioner as well as the findings set forth above with District administration and Board members.

(Compl. ¶¶ 37 & 38.) As the Court has already explained, even if Plaintiff did not himself inform the Individual Defendants about these matters, it is certainly plausible that the administrative staff and members of the Board that he did share this information would share it with the other members of the Board. Second, the

---

[2] The Court notes that to the extent the complaint can be read to assert a claim of intimate association, any such claim has been abandoned as Plaintiff argues only that he and Waronker were joined in an expressive association. (*See* Pl.'s Mem. at 19.)

Court will not consider the 50-h testimony on this motion which is addressed to the pleadings.

The motion to dismiss the New York law whistleblower claims is denied.

## CONCLUSION

For the reasons set forth above, Defendants' motion is granted as the First Amendment retaliation claim based on Plaintiff's speech to the Board regarding items of mismanagement, corruption, and malfeasance, and on Plaintiff's First Amendment freedom of association claim; it is otherwise denied.

**SO ORDERED.**

Dated: Central Islip, New York
   June 28, 2019

        s/ Denis R. Hurley
       Denis R. Hurley
       United States District Judge