UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
DR. VARLETON McDONALD,

                       Plaintiff,

      -against-

HEMPSTEAD UNION FREE SCHOOL
DISTRICT, BOARD OF EDUCATION OF THE
HEMPSTEAD SCHOOL DISTRICT, DAVID B.
GATES, *Individually and in his official capacity,*
RANDY STITH, *Individually and in his official
capacity,* and LAMONT E. JOHNSON,
*Individually and in his official capacity,*

                       Defendants.
------------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**
18-CV-5658 (DRH)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court in this First Amendment free speech-retaliation litigation, on referral from the Honorable Denis R. Hurley for report and recommendation, is Defendants' Hempstead Union Free School District (the "District"), the District's Board of Education (the "Board"), and Board members David B. Gates ("Gates"), Randy Stith ("Stith"), and Lamont E. Johnson ("Johnson") (Gates, Stith, and Johnson collectively, the "Individual Defendants," and together with the District and the Board, "Defendants") motion for summary judgment ("Defendants' Motion" or "Def. Mot."), pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), Docket Entry ("DE") [40].

By way of Complaint dated October 10, 2018, McDonald commenced this action against Defendants pursuant to 42 U.S.C. § 1983 seeking "injunctive and monetary relief" for: (1) alleged violations of Plaintiff's rights under the First and Fourteenth

Amendments of the United States Constitution; and (2) New York State statutory retaliation claims. *See* Complaint ("Compl."), DE [1]. Defendants deny any liability. *See* Defendants' Answer ("Ans."), DE [17]. For the reasons set forth below, the Court respectfully recommends that Defendants' Motion be granted as to McDonald's Section 1983 claim against the Individual Defendants in their official capacities, but denied in all other respects.

## I.     BACKGROUND

### A.  <u>The Parties</u>

The following facts are taken from the parties' pleadings, declarations, exhibits and Local Rule 56.1 statements. Except where indicated, these facts are not in dispute.

Plaintiff is a New York resident, residing in New York County. *See* Defendants' Local Rule 56.1(a) Statement of Undisputed Material Facts ("Def. 56.1"), DE [41], ¶ 3. The District is the school district for the Village of Hempstead, located in Nassau County, New York. *Id.* at ¶ 4. The Board, which governs the District, is composed of five elected members. *Id.* at ¶ 5. Gates was appointed to a seat on the Board as a Trustee on or about March 4, 2016, and served in this capacity until his death on March 25, 2020. *Id.* at ¶ 6. Stith was elected to a seat on the Board as a Trustee on or about May 16, 2017, and served in this capacity from July 1, 2017 until the expiration of his term on June 30, 2020. *Id.* at ¶ 7. Johnson was elected to a seat on the Board as a Trustee on or about May 21, 2013, subsequently removed by the

Board "for purported misconduct," reinstated to his seat as a Trustee on or about November 27, 2017, and currently serves as the Board's President. *Id.* at ¶ 8.

### B. <u>Plaintiff's Hiring and Initial Investigations</u>

On or about September 28, 2017, the Board tentatively approved Plaintiff's appointment to serve as the District's Deputy Superintendent of Schools from October 30, 2017 through June 30, 2018. *Id.* at ¶¶ 9, 11.  McDonald's appointment was contingent on the District receiving a hiring waiver from the New York State Department of Education (the "NYSDOE"), pursuant to New York Retirement and Social Security Law § 211. *Id.* Because Plaintiff had previously worked for the New York City Department of Education, he could not work for the District without the § 211 waiver. *Id.* at ¶ 10. On November 1, 2017, The NYSDOE retroactively granted McDonald's § 211 waiver. *Id.* at ¶ 12.

On November 6, 2017, the District's then-Superintendent of Schools, Shimon Waronker ("Waronker"), wrote a letter to the Hempstead community introducing Plaintiff as the District's new Deputy Superintendent of Schools, and informing the community that McDonald, Waronker's former supervisor, had "received a waiver from the [NYSDOE] from September 1, 2017 to June 30, 2018." *Id.* at ¶ 13. Plaintiff's employment with the District commenced on or about November 7, 2017. *Id.* at ¶ 14.

As Deputy Superintendent, Plaintiff's responsibilities included:   (1) "supervis[ing] the District's assistant superintendents and chief information officer"; (2) "oversee[ing] administration of the fiscal and human resources of assigned departments"; (3) "assist[ing] in the preparation and administration of budget from

assigned departments"; (4) "support[ing Waronker] in the review and revision of operational goals and objectives and efforts to measure progress toward their attainment"; (5) "establish[ing] and maintain[ing] effective working relationships with community and state agencies, area businesses, industries, and other organizations"; (6) "collaborat[ing] and work[ing] cooperatively with advisory boards"; and (7) "respond[ing] to parent and community concerns." *See* Declaration of Dr. Varleton McDonald in Opposition to Defendants' Motion for Summary Judgment, ("McDonald Decl."), DE [42], ¶ 19.[1]  After Plaintiff's hire, Waronker and McDonald undertook extensive reviews to curb violence in the District's schools, implement new security plans, and create new and improved attendance and discipline policies. *Id.* at ¶ 6 .  Special investigators and a forensic auditing firm known as Plante Moran were brought in to address the District's corruption and mismanagement. *Id.*

## C. <u>Plaintiff's Communication with Federal and State Authorities</u>

In approximately early to mid-December 2017, Plaintiff and Waronker met with representatives of the Federal Bureau of Investigation (the "FBI") at the FBI's Long Island office, located in Mineola, Nassau County. *See* Def. 56.1 ¶ 15.  During this meeting, Waronker mostly spoke about the findings of their investigations, while McDonald provided the FBI with additional information about those findings. *Id.* at

---

[1] Defendants do not dispute Plaintiff's contention regarding his job responsibilities in their pleadings. *See* Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Def. Mem."), DE [40-21], at 8; Defendants' Memorandum of Law in Further Support of their Motion for Summary Judgment and in Reply to Plaintiff's Opposition to the Motion ("Def. Reply"), DE [44], at 2-3.

¶ 16.   At this meeting, Plaintiff told the FBI about falsely reported student registrations and fraudulently procured funding. *Id.* at ¶ 17.  The meeting also covered:  (i) school safety and security issues arising from unsupervised and unauthorized students in the hallways; (ii) gang presence and the absence of effective policies; (iii) chronic student absences without corrective policies; (iv) weapons in the schools, including weapons confiscated from students and stored without appropriate inventory procedures or surrender to law enforcement; (v) attendance at the schools by students who were no longer eligible as students; (vi) former employees being paid although no longer working; and (vii) patronage hiring of ineffective and poor-performing security personnel. *See* Transcript of October 22, 2020 Deposition of Dr. Varleton McDonald ("McDonald Dep."), DE [40-6], at 38:18-39:5, 44:14-22.

At the end of the meeting, Waronker and McDonald were instructed to maintain confidentiality until further FBI guidance. *See* Def. 56.1 ¶ 18.  While Plaintiff did not *immediately* tell anyone about this meeting with the FBI, *id.* at ¶¶ 19, 44-47, 54-56, he did subsequently speak to Lawrence Dobroff ("Dobroff"), the District's Assistant Superintendent for Business, and Maribel Touré, then-Board President, about the meeting. *See* McDonald Dep. 48:6-52:8.  Similarly, Waronker sent an email dated December 6, 2017 to, among others, the Individual Defendants, disclosing the meeting. *Id.*

On or about December 4, 2017, Plaintiff and Waronker met with the NYSDOE's Deputy Commissioner via videoconference regarding the same issues covered in their meeting with the FBI. *See* Def. 56.1 ¶¶ 20, 23-24.  Waronker and

McDonald presented a PowerPoint slide deck during this meeting, detailing their concerns of corruption and impropriety within the District. *Id.* at ¶¶ 21-22, 25. Outside of this presentation, the parties dispute the extent to which Plaintiff spoke during the meeting. *Id.* at ¶ 26; McDonald Dep. 59:16-60:4.

### D. **Plante Moran Preliminary Report**

In late December 2017, after their conversations with federal and state authorities, Plaintiff and Waronker met with representatives of Plante Moran, the District's forensic auditors, regarding the findings of Plante Moran's audit. *See* McDonald Dep. 61:23-62:25. After this meeting, McDonald apparently informed Regina Armstrong ("Armstrong"), then the District's Associate Superintendent for Elementary Education and Curriculum, that the forthcoming Plante Moran report set forth "questionable things," to which Armstrong responded, "don't worry about it. The Board is already taking care of that." *Id.* at 66:14-67:18.

On January 8, 2018, the Individual Defendants voted to place Waronker on administrative leave, and appointed Armstrong to serve as the District's Interim Superintendent. *See id.* at 65:19-25. On January 11, 2018, Dobroff, pursuant to a request from Waronker, sent Plaintiff a copy of a preliminary report issued by Plante Moran. *See* Def. 56.1 ¶¶ 27-28, 33; *see also* Plante Moran Preliminary Findings (the "Report'), attached as Exhibit A, DE [42-2], to McDonald Decl. The Report set forth numerous financial improprieties including, among other things, that a company identified as "Easy A Tutoring," which was owned by Defendant Johnson's domestic partner, received millions of dollars from the District for tutoring services, but had

6

forged approval signatures and inflated billing times and rates. *See* Report at 4-24. Plaintiff and Waronker spoke about the Report. *Id.* at ¶ 32. McDonald then sent the Report to Armstrong via the District's email system. *Id.* at ¶¶ 29-30. While Plaintiff did not individually send the Report to the Individual Defendants, *see id.* at ¶¶ 34-36, he avers that he sent the Report to Armstrong with the intention that she would forward it to the Individual Defendants. *See* McDonald Dep. 69:17-19.

### E. Plaintiff's Termination

Shortly after receiving the Report, at a January 17, 2018 Board meeting, Armstrong, in her capacity as the District's then-Acting Superintendent of Schools, recommended to the Board that McDonald be terminated from his employment with the District. *See* Def. 56.1 ¶ 37. Prior to this meeting, Armstrong instructed Plaintiff not to attend, because the Board apparently "didn't want [McDonald] in the meeting." *See* McDonald Dep. 72:9-73:9. Defendants aver that Armstrong recommended McDonald's termination because: (1) the Deputy Superintendent position was not part of the publicly approved budget for the 2017-2018 school year; and (2) Armstrong did not feel the position was necessary. *See* Def. 56.1 ¶¶ 38-39. Plaintiff, on the other hand, contends that the Individual Defendants had determined to terminate McDonald prior to the January 17, 2018 meeting, and alleges that the reasons provided by Defendants for Armstrong's recommendation are untrue and pretextual. *See* Plaintiff's Counterstatement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1(B) ("Pl. 56.1"), DE [43], ¶ 38.

7

The Individual Defendants voted to terminate Plaintiff's employment at the January 17, 2018 Board meeting. *See* Def. 56.1 ¶¶ 40-43. The parties disagree regarding the Individual Defendants' motivation in voting to terminate McDonald's employment. Defendants contend that the Individual Defendants cast their votes based on Armstrong's recommendation and their own observations regarding the District's need to continue to employ Plaintiff as Deputy Superintendent. Def. 56.1 ¶¶ 40-42, 48-53, 57-60. McDonald counters that the Individual Defendants voted to terminate him in retaliation for Plaintiff's communications with the FBI and NYSDOE. *See* Pl. 56.1 ¶¶ 40-42, 48-53, 57-60.

### F. **Procedural History**

Based on the above, Plaintiff commenced this action against Defendants on October 10, 2018. *See* Compl. The Complaint – seeking injunctive relief, damages, and attorneys' fees in connection with Defendants' treatment of McDonald – alleges that Plaintiff's termination violated his First Amendment rights to free speech and free association as it was: (1) in retaliation for "communicat[ing] the finding of corruption and mismanagement…to the FBI, [NYSDOE,] District administration and Board members"; and (2) motivated by his association with Waronker. *Id.* McDonald also asserts statutory retaliation claims pursuant to New York Civil Service Law § 75-b and New York Education Law § 3028-d. *See id.* On January 22, 2019, Defendants moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), *see* DE [13], which Plaintiff opposed. *See* DE [14]. On June 28, 2019, Judge Hurley granted Defendants' Motion to Dismiss "as [to] the First Amendment retaliation

claim based on Plaintiff's speech to the Board regarding items of mismanagement, corruption, and malfeasance, and on Plaintiff's First Amendment freedom of association claim," but allowed the remainder of McDonald's Complaint to survive. *See* DE [16].  Defendants filed their Answer to the Complaint on July 22, 2019.  *See* Ans.  Discovery followed.  On July 20, 2021, Defendants moved for summary judgment, *see* Def. Mot., which Plaintiff opposes.  *See generally* Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment ("Pl. Opp."), DE [42-3].  For the reasons set forth below, the Court respectfully recommends that Defendants' Motion be granted as to McDonald's Section 1983 claim against the Individual Defendants in their official capacities, but denied in all other respects.

## II.    LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the burden of establishing that there are no issues of material fact such that summary judgment is appropriate.  *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004).  In deciding the motion, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986) (holding that a motion for summary judgment

should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the movant has met its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts…. [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986) (internal quotation omitted); *see also Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 542 (E.D.N.Y. 2014) ("An issue of fact is considered 'genuine' when a reasonable finder of fact could render a verdict in favor of the non-moving party").

In determining whether summary judgment is warranted, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986); *see also Artis v. Valls*, No. 9:10-cv-427, 2012 WL 4380921, at *6, n. 10 (N.D.N.Y. Sept. 25, 2012) ("It is well established that issues of credibility are almost never to be resolved by a court on a motion for summary judgment.").

## III.    DISCUSSION

Applying the standards set forth above, and for the reasons set forth below, the Court respectfully recommends that Defendants' Motion be granted as to McDonald's Section 1983 claim against the Individual Defendants in their official capacities, but denied in all other respects.

A. **Plaintiff's First Amendment Retaliation Claim**

Initially, McDonald's First Amendment Section 1983 claim is based on the argument that he was retaliated against because of his participation in three constitutionally protected activities: (i) Plaintiff's and Waronker's conversation with the FBI; (ii) McDonald's and Waronker's videoconference with the NYSDOE; and (iii) Plaintiff's forwarding of the Report to Armstrong via the District's email system. *See* Compl. ¶¶ 51-53; *see generally* Pl. Opp. Defendants seek summary judgment, arguing that Plaintiff has failed to "demonstrate that the [Individual Defendants] who terminated [McDonald's] employment on January 17, 2018 knew or were aware of [Plaintiff's] protected activity" at the time they voted to do so. Def. Mem. at 2.

42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State… subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured….

42 U.S.C. § 1983. Although Section 1983 itself does not create substantive rights, it does provide "a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). To prevail on a claim arising under 42 U.S.C. § 1983, a plaintiff must demonstrate: "(1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law." *Hawkins v. Nassau Cnty. Corr. Facility*, 781 F. Supp. 2d 107, 111 (E.D.N.Y. 2011) (citing 42 U.S.C. § 1983); *see also Dubin v.*

11

*County of Nassau*, 277 F. Supp. 3d 366, 384 (E.D.N.Y. 2017) (quoting *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010)).

In the Second Circuit, a claim for First Amendment retaliation depends on the factual context from which it stems. *See Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008). Where, as here, a public employee brings a retaliation claim, the plaintiff must prove that: "(1) [he] engaged in constitutionally protected speech because [he] spoke as [a] citizen[ ] on a matter of public concern; (2) [he] suffered an adverse employment action; and (3) the speech was a motivating factor in the adverse employment decision." *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (internal citations omitted). "[T]he causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action." *Kohutka v. Town of Hempstead*, 994 F. Supp. 2d 305, 318 (E.D.N.Y. 2014) (quoting *Anemone v. Metropolitan Transp. Auth.*, 410 F. Supp. 2d 255, 267 (S.D.N.Y. 2006)). "In determining 'whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play,' the Supreme Court analyzes 'whether an intent to convey a *particularized message* was present and whether the *likelihood was great* that the message would be understood by those who viewed it.'" *Toussie v. County of Suffolk*, 806 F. Supp. 2d 558, 577 (E.D.N.Y. 2011) (quoting *Young v. N.Y.C. Transit Auth.*, 903 F.2d 146, 153 (2d Cir. 1990) (emphasis in *Young*)); *see also Spence v. Washington*, 418 U.S. 405, 410-11, 94 S. Ct. 2727, 2730 (1974).

Applying these standards, the Court concludes that McDonald has established a *prima facie* case for retaliation under the First Amendment, and respectfully recommends that Defendants' Motion be denied as to this claim.  Here, Defendants concede that Plaintiff's employment termination constituted an adverse employment action.  *See* Def. Mem. at 13.  Further, McDonald has established that:  (1) his communications with the FBI and NYSDOE, and forwarding of the Report to Armstrong via the District's email system constituted speech protected under the First Amendment; and (2) issues of material fact exist regarding whether Defendants retaliated against him because of this speech, precluding summary judgment.

### 1. <u>McDonald Engaged in Constitutionally Protected Speech</u>

Initially, Defendants assert that Plaintiff's First Amendment retaliation cause of action is defective because McDonald did not participate as a private citizen when he met with the FBI and NYSDOE, or forwarded the Report to Armstrong.  *See* Def. Mem. at 6.  Typically, "[w]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 1960 (2006).  Nonetheless, there are times when a public employee's speech falls within the ambit of the First Amendment.  To determine whether a public employee's speech is protected, courts conduct a two-step inquiry.  *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015).  First, a court must determine "whether the employee spoke as a citizen on a matter of public concern."  *Id.* (quoting *Garcetti*, 547 U.S. at

418, 126 S. Ct. at 1958). This step one inquiry in turn encompasses two separate sub-questions: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Jackler v. Byrne,* 658 F.3d 225, 235 (2d Cir. 2011) (citing *Garcetti,* 547 U.S. at 420-22, 126 S. Ct. at 1959-60).

a. *McDonald Spoke on Matters of Public Concern*

Speech touches upon a matter of public concern when it relates to an area of political, social, or other concern relevant to the community. *See Connick v. Myers*, 461 U.S. 138, 148, 103 S. Ct. 1684, 1689-90 (1983) (explaining that if the plaintiff's speech did not touch upon a matter of public concern, it was "unnecessary for [the court] to scrutinize the reasons for [his] discharge"); *see also Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008) (finding employee's speech unprotected because "[i]t did not seek to advance a public purpose"). In the public employee context, an individual may be motivated by a personal grievance, but this does not necessarily foreclose the possibility that she is also speaking out on a matter of public concern. *See Sousa v. Roque*, 578 F.3d 164, 173 (2d Cir. 2009). For example, even when interwoven with personal employment issues, if a public employee is speaking out about and seeking redress for matters that relate to public corruption, such actions have been found to touch upon matters of public concern. *See Golodner v. Berliner*, 770 F.3d 196, 205 (2d Cir. 2014) (recognizing that the "exposure of official misconduct...is generally of great consequence to the public") (internal quotations and citations omitted). Here, as Defendants do not dispute that McDonald's speech

14

touched upon a matter of public concern, *see generally* Def. Mem., the Court deems this point conceded and evaluates whether Plaintiff spoke as a public employee or citizen for First Amendment purposes during his meetings with the FBI and/or NYSDOE, or in forwarding of the Report to Armstrong.

### b. *McDonald Spoke as a Citizen for First Amendment Purposes*

Where, as here, the speaker claiming First Amendment protection is a public employee, the Second Circuit has identified "two relevant inquiries to determine whether a public employee speaks as a citizen:  (1) whether the speech fall[s] outside of the employee's official responsibilities, and (2) whether a civilian analogue [(*i.e.*, a form or channel of discourse available to non-employee citizens)] exist[s]."  *Novick v. Vill. of Wappingers Falls, New York*, 376 F. Supp. 3d 318, 331 (S.D.N.Y. 2019) (quoting *Montero v. City of Yonkers,* 890 F.3d 386, 397 (2d Cir. 2018) (internal citations, alterations, and quotations marks omitted) (brackets in original)).  *See also Matthews*, 779 F.3d at 172 (citing *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203-04 (2d Cir. 2010)).  This is a conjunctive test, meaning that "[i]f an employee did not speak as a citizen on a matter of public concern, the inquiry ends – the speech was not constitutionally protected."  *Alvarez v. Staple*, No. 17-cv-935, 2018 WL 5312901, at *7 (S.D.N.Y. Oct. 26, 2018).

While the second issue "may be of some help in determining whether one spoke as a citizen," it is not dispositive – the first inquiry is the critical one.  *Montero,* 890 F.3d at 397-98.  Speech can be "'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in

15

response to a request by the employer." *Weintraub*, 593 F.3d at 203; *see also Matthews*, 779 F.3d at 174 (holding that "when a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee.").  If, however, both questions are answered in the affirmative, the court then proceeds to the second step of the inquiry:  whether the relevant government entity "had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." *Lane v. Franks*, 573 U.S. 228, 242, 134 S. Ct. 2369, 2380 (2014) (citing *Garcetti,* 547 U.S. at 418, 126 S. Ct. at 1958); *see also Pickering v. Bd. of Ed. of Tp. High School Dist. 205, Will County, Illinois*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734, (1968).  "Ultimately, the question…is whether the employee's speech was part-and-parcel of [that person's] concerns about his ability to properly execute his duties." *Montero,* 890 F.3d at 398 (citation and quotation marks omitted).

Applying the *Montero* test to the facts at hand, the Court concludes that McDonald spoke as a private citizen, not a public employee, when he met with the FBI and NYSDOE and forwarded the Report to Armstrong.

### i.   McDonald's Speech Fell Outside of his Official Responsibilities

The first prong of the *Montero* test requires the Court to evaluate whether McDonald's purportedly protected speech "[fell] outside of the [his] official responsibilities." *Montero*, 890 F.3d at 397.  The Court's determination requires an

examination of Plaintiff's responsibilities as Deputy Superintendent.  *See Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012) ("Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two.  Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision." (internal citation omitted)). Indeed, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee – rather than citizen – speech.  The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."  *Lane*, 573 U.S. at 240, 134 S. Ct. at 2379; *see also Hagan v. City of New York*, 39 F. Supp. 3d 481, 510 (S.D.N.Y. 2014) (quoting *Lane*, 573 U.S. at 236, 134 S. Ct. at 2377) ("employee speech is not precluded from protection simply because it 'concerns information related to or learned through public employment.'")).

Applying this case law, the Court concludes that McDonald's speech during his meetings with the FBI and NYSDOE, and transmission of the Report to Armstrong fell outside of his official responsibilities as Deputy Superintendent.  An initial review of the parties' moving papers reveals no disagreement that, as the District's Deputy Superintendent, Plaintiff's job responsibilities included:  (1) "supervis[ing] the District's assistant superintendents and chief information officer"; (2) "oversee[ing] administration of the fiscal and human resources of assigned departments"; (3) "assist[ing] in the preparation and administration of budget from assigned departments"; (4) "support[ing Waronker] in the review and revision of operational

17

goals and objectives and efforts to measure progress toward their attainment"; (5) "establish[ing] and maintain[ing] effective working relationships with community and state agencies, area businesses, industries, and other organizations"; (6) "collaborat[ing] and work[ing] cooperatively with advisory boards"; and (7) "respond[ing] to parent and community concerns." *See* McDonald Decl. ¶ 19; *see also* Def. Reply at 3-4.    While Defendants also appear to argue that "uncovering corruption" and "report[ing] corruption to the proper legal authorities" should fall within the ambit of McDonald's job responsibilities as Deputy Superintendent, *see id.*, their argument is anecdotal and based neither on case law nor Plaintiff's employment contract with the District.    Indeed, Defendants offer no admissible evidence that the District hired McDonald, in whole or in part, to investigate or report to authorities the corruption that had apparently existed within the District long before Plaintiff was hired.  At the very least, there is a question of material fact as to this issue sufficient to defeat summary judgment.

As uncovering corruption within the District and reporting to authorities were at least arguably outside of McDonald's job responsibilities as Deputy Superintendent, the Court further concludes that there are material issues of fact as to whether his meetings and conversations with both the FBI and NYSDOE fell outside of those responsibilities as well.  The parties do not dispute that during these meetings, both Waronker and McDonald recounted to authorities their findings of corruption, financial fraud, and mismanagement within the District.  *See* Def. 56.1 ¶¶ 15-17, 20-25; McDonald Dep. 38:18-39:5, 44:14-22.

Similarly, the Court concludes that there are material factual questions as to whether Plaintiff acted outside of his job responsibilities when he sent the Report to Armstrong. While Defendants contend that McDonald did not engage in protected speech when he forwarded the Report to Armstrong "up the chain of command," Def. Mem. at 12, multiple courts within this Circuit have held that the dispositive issue in determining whether a public employee's communications to a supervisor are protected by the First Amendment is whether that speech is "relate[d] to tasks within the scope of [the plaintiff's] employment[,]" and rejected similar arguments made by parties in Defendants' positions. *Rafferty v. Hempstead Union Free Sch. Dist.*, No. 18-cv-3321, 2020 WL 7024311, at *5 (E.D.N.Y. Nov. 30, 2020); *see also Ross*, 693 F.3d at 307 ("Speech to a supervisor even in the workplace can be protected as that of a private citizen if it is not made pursuant to the employee's official duties as an employee."); *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.,* 444 F.3d 158, 165 (2d Cir. 2006) (holding public employee's private letter to superintendent receives First Amendment protection). Here, Defendants identify no part of Plaintiff's duties and responsibilities as Deputy Superintendent related to uncovering or reporting the corruption and financial improprieties set forth in the Report and, outside of their offhand and unsupported "chain of command" argument, offer no evidence to support their summary judgment motion as to this claim.[2] For those reasons, the Court

---

[2] While the Court can imagine a situation where McDonald's reporting corruption and financial improprieties *could* fall within his job responsibilities as recounted in the text, Defendants do not attempt to make that argument. They instead seek to graft an additional job responsibility onto Plaintiff's role by virtue of his and Waronker's alleged reputations as "reformers." *See* Def. Reply at 3. Because Defendants offer no admissible evidence to buttress their position, the Court will not continue further with its analysis on this point.

concludes that Plaintiff's speech fell outside of his job responsibilities, and respectfully recommends that Defendants' Motion be denied as to this component of McDonald's First Amendment retaliation cause of action.

### ii.    Civilian Analogues Exist for McDonald's Protected Speech

Under the *Montero* test's second prong – which Defendants do not address in their motion papers – courts analyze whether a public employee seeking First Amendment protection utilized a "civilian analogue" – specifically, a "form or channel of discourse available to non-employee citizens" – in order to speak. *Novick*, 376 F. Supp. 3d at 331. "Speech has a relevant civilian analogue if it is made through channels generally available to citizens. An indicium that speech by a public employee has a civilian analogue is that the employee's speech was to an independent state agency responsible for entertaining complaints by any citizen in a democratic society regardless of his status as a public employee." *Matthews*, 779 F.3d at 175 (internal citation and quotation marks omitted). Both the Supreme Court and Second Circuit have repeatedly held that the absence of a civilian analogue could preclude conferral of First Amendment protection to a public employee's speech. *See Lane*, 573 U.S. at 240, 134 S. Ct. at 2379; *Weintraub*, 593 F.3d at 204 (finding the plaintiff's employee grievance filed pursuant to procedures set forth in a collective bargaining agreement not protected speech because "there [was] no relevant citizen analogue.").

Applying these standards, the Court concludes that civilian analogues exist for both of Plaintiff's interactions with federal and state authorities, as well as his transmission of the Report to Armstrong. Here, when McDonald spoke to the FBI

and NYSDOE, he used a mode of communication that has been traditionally available to, and utilized by, citizens seeking to expose corruption and fraud in the educational context. Indeed, the Second Circuit has held that complaints made to "inspector[s] general" or "sent to an outside entity" like the FBI or NYSDOE are channels that are "available to non-employee citizens." *Weintraub*, 593 F.3d at 204; *see also Jackler*, 658 F.3d at 241; *Morales v. City of New York*, 525 F. Supp. 3d 463, 476 (S.D.N.Y. 2021).

Likewise, the Court concludes that a civilian analogue exists for Plaintiff's transmission of the Report to Armstrong because he alerted Armstrong to the Report's findings via e-mail, a means of communication of which any citizen with documented reports of fraud, corruption, or misconduct within the District could have availed themselves. *See Buchanan v. City of New York*, No. 21-cv-660, 2021 WL 3726963, at *5 (S.D.N.Y. Aug. 23, 2021). For these reasons, the Court concludes that Plaintiff has sufficiently established the existence of civilian analogues to his communications to the FBI, NYSDOE, and Armstrong. Accordingly, the Court concludes that McDonald engaged in constitutionally protected speech, and respectfully recommends that Defendants' Motion be denied as to this component of Plaintiff's First Amendment retaliation claim.

2. Issues of Material Fact as to a Causal Connection Between Plaintiff's Protected Speech and the Individual Defendants' Decision to Terminate His Employment Preclude Summary Judgment

Here, because the Court has determined that McDonald engaged in protected speech when he and Waronker met with the FBI and NYSDOE, and when Plaintiff

forwarded the Report to Armstrong, the Court next analyzes whether McDonald has established a causal connection between this speech and the Individual Defendants' decision to terminate his employment with the District. Under this analysis, the causal connection between a plaintiff's protected speech and alleged adverse employment action must lead a court to conclude that the speech "was a motivating factor in the determination," which may be established "either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Kohutka*, 994 F. Supp. 2d at 319-20 (quoting *Morris v. Lindau*, 196 F.3d 102, 109-10 (2d Cir. 1999)).

A review of the record demonstrates issues of material fact regarding the Individual Defendants' knowledge of Plaintiff's engagement in protected speech and motivation at the time they voted to terminate his employment. Based on this conflicting evidence, the Court concludes that summary judgment in Defendants' favor on this component of Plaintiff's First Amendment retaliation claim would be improper. As to Plaintiff's meetings with the FBI and NYSDOE, Defendants offer affidavits from Johnson and Stith[3], which aver that the Individual Defendants neither knew about McDonald's and Waronker's meetings with the FBI and/or NYSDOE, nor the contents of the Report, at the time they voted to terminate McDonald's employment. *See* DEs [40-1], [40-2]. Indeed, these affidavits contend that the Individual Defendants relied primarily on Armstrong's recommendation to

---

[3] Defendant Gates passed away on March 25, 2020, over a year prior to the filing of Defendants' Motion. *See* Def. 56.1 ¶ 6; Def. Mot.

terminate Plaintiff's position because of the District's budgetary concerns when they voted to do so on January 17, 2018. *See id.* In opposition, McDonald offers the Declaration of Maribel Touré, a member of the Board from 2014 through July 2018 and President of the Board during the 2017-2018 school year, which states that, in December 2017 and January 2018, the Board – including the Individual Defendants – had multiple meetings and discussions regarding Plaintiff's and Waronker's meetings with the FBI and NYSDOE. *See* DE [42-1]. According to Touré, "there is no doubt that each of the Board members were aware that [Waronker and McDonald] met with the FBI and [NYSDOE]" regarding the corruption and security issues in the District. *Id.* This Declaration, coupled with McDonald's testimony that, after his and Waronker's meeting, Gates stated to Plaintiff, "word on the street is you have been making moves," *see* McDonald Dep. 71:11-16, establishes, at the very least, issues of material fact regarding the Individual Defendants' knowledge of Plaintiff's engagement in protected speech and motivation when they voted to terminate his employment. This conflict between the parties' contentions highlights a critical issue of material fact, which may only be resolved at trial.

Additionally, Armstrong's recommendation to the Board that Plaintiff's employment with the District be terminated came less than a month after McDonald's meetings with the FBI and NYSDOE, and less than a week after Armstrong received the Report, further militating against summary judgment as to the causation component of McDonald's First Amendment retaliation claim. Indeed, a plaintiff may establish a causal connection between constitutionally protected

speech and an adverse employment action "by showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009); *see also Zehner v. Jordan-Elbridge Board of Education*, 666 Fed. App'x 29, 32 (2d Cir. 2016) (finding a period of "[n]ot even a month" between the protected activity and adverse employment action sufficient to defeat summary judgment on plaintiff's First Amendment retaliation claim); *Ramirez v. Hempstead Union Free Sch. Dist.*, 33 F. Supp. 3d 158, 173 (E.D.N.Y. 2014); *Dillon v. Suffolk County Dept. of Health Servs.*, 917 F. Supp. 2d 196, 214 (E.D.N.Y. 2013) (finding "the alleged retaliatory actions all took place within a few weeks of the plaintiff's protected activities...sufficient for the plaintiff to meet her burden to demonstrate a causal connection and establish a *prima facie* case of retaliation" and defeat summary judgment); *Murray v. Town of North Hempstead*, 853 F. Supp. 2d 247, 273 (E.D.N.Y. 2012) ("Theoretically, temporal proximity can be a sufficient basis from which to infer a causal connection as a matter of law."). Further, even where a plaintiff satisfies the elements of a First Amendment retaliation claim, a defendant may escape liability by showing by a preponderance of the evidence that it would have taken the same adverse employment action in the absence of the protected speech. *Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003).

In this situation, however, the Court concludes that the approximately four weeks between McDonald's meetings with the FBI and NYSDOE and Armstrong's recommendation to the Board, and the six days between Plaintiff's January 11, 2018 transmission of the Report to Armstrong, and Armstrong's January 17, 2018

recommendation to the Board that McDonald be terminated, *see* Def. 56.1 ¶¶ 27-37, are short enough periods of time to create "genuine dispute[s] of material fact" regarding causation and defeat Defendants' motion for summary judgment as to Plaintiff's First Amendment retaliation cause of action. *See Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013). Accordingly, the Court respectfully recommends that Defendants' Motion be denied as to McDonald's First Amendment retaliation cause of action.

3.  <u>The District Is Not Entitled to Summary Judgment – *Monell* Liability</u>

Defendants next seek summary judgment in favor of the District, pursuant to *Monell v. Dept. of Soc. Serv. of City of New York,* 436 U.S. 658, 658-59, 98 S. Ct. 2018, 2019-20 (1978), arguing that "Plaintiff's allegations against the District are insufficient as a matter of law to impose liability against the District because no District policy or custom exists to serve as a basis for a violation of the Plaintiff's civil rights, more specifically his freedom of speech." Def. Mem. at 22-23. McDonald's *Monell* claim is premised on the theory that the District bears responsibility for the constitutionally-violative decision of the Individual Defendants – its "policymakers," who possessed and exercised "final decision-making authority" when they voted to terminate his employment with the District, "thereby resulting in the violation of Plaintiff's First Amendment rights." Pl. Opp. at 24.

Under *Monell*, municipalities and other local governmental entities may be held liable under 42 U.S.C. § 1983 for constitutional violations caused by the municipality through an official policy or custom. *See* 436 U.S. at 658-59, 98 S. Ct. at

2019-20; *see also Patterson v. County. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004). The "policy or custom" element may be established by demonstrating: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policymaker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. *See Kucharczyk v. Westchester Cnty.*, 95 F. Supp. 3d 529, 538-39 (S.D.N.Y. 2015) (citing *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)); *see also Jones v. Westchester Cnty. Dep't of Corr. Med. Dep't*, 557 F. Supp. 2d 408, 419 (S.D.N.Y. 2008). In the context of a § 1983 action against a school district:

> [a] school district's liability under *Monell* may be premised on any of three theories: (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee was acting as a "final policymaker."

*Gerardi v. Huntington Union Free Sch. Dist.*, 124 F. Supp. 3d 206, 226 (E.D.N.Y. 2015) (quoting *Hurdle v. Bd. of Educ. of City of New York*, 113 Fed. App'x 423, 424-25 (2d Cir. 2004)). Here, Plaintiff does not substantively allege that his constitutional rights were violated because of an official District policy or longstanding practice or custom; instead, he relies on the third theory – that the Individual Defendants were

acting as "final policymakers" when they voted to terminate his employment with the District.  *See* Pl. Opp. at 24.

Whether a district employee acted as a final policymaker "is a legal question, which is to be answered on the basis of state law." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020) (quoting *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000)).  Importantly, "the official in question need not be a municipal policymaker for all purposes" but rather "must be 'responsible under state law for making policy *in that area* of the [municipality's] business'" that concerns the challenged conduct. *Jeffes*, 208 F.3d at 57 (alterations in original) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S. Ct. 915, 924 (1988)).  A final policymaker, however, "is someone 'whose edicts or acts may fairly be said to represent official policy' for the entire municipality." *Agosto*, 982 F.3d at 98 (quoting *Monell*, 436 U.S. at 694).

Courts in this District "have concluded that only Boards of Education have final policymaking authority for personnel decisions in New York public school districts." *Kennedy v. Bethpage Union Free Sch. Dist.*, No. 20-cv-72, 2021 WL 4480668, at *4-5 (E.D.N.Y. Sept. 30, 2021) (quoting *O'Kane v. Plainedge Union Free Sch. Dist.*, No. 16-cv-5693, 2019 WL 4575390, at *4 (E.D.N.Y. Sept. 20, 2019) (collecting cases)).  This is because Boards of Education have the power to establish "rules and regulations concerning the order and discipline of the schools.'" *Port Washington Teachers' Ass'n v. Bd. of Educ. of Port Washington Union Free Sch. Dist.*, 478 F.3d 494, 500 (2d Cir. 2007) (alterations in original) (citing N.Y. Educ. Law § 1709); *see also Cincotta v. Hempstead Union Free Sch. Dist.*, 313 F. Supp. 3d 386, 410

(E.D.N.Y. 2018) ("The Board is the final decision maker in the District."); *Jones v. Bay Shore Union Free Sch. Dist.*, 170 F. Supp. 3d 420, 439 (E.D.N.Y. 2016).

Applying these standards, the Court concludes that based on the undisputed facts regarding the Individual Defendants' direct involvement in voting to terminate McDonald's employment, and the issues of material fact regarding whether they did so in retaliation for Plaintiff's engagement in constitutionally protected speech, summary judgment in the District's favor is inappropriate. Initially, Defendants appear to concede that the Individual Defendants acted as the District's "final policymakers" when they terminated McDonald's employment. *See* Def. Reply at 9. This concession, when combined with the above analysis regarding the Individual Defendants' direct involvement – on the District's behalf – in the alleged violation of Plaintiff's constitutional rights, is sufficient to defeat Defendants' motion as to the *Monell* component of Plaintiff's First Amendment retaliation cause of action. *See Jeffers v. City of New York*, No. 15-cv-2965, 2015 WL 3915306, at *2 (E.D.N.Y. Jun. 25, 2015); *Rosu v. City of New York*, No. 11-cv-5437, 2012 WL 6582534, at *5 (S.D.N.Y. Dec. 13, 2012) ("In order for an individual to be subject to Section 1983 liability in his or her official capacity, that individual must have had personal involvement in [the] alleged constitutional deprivations [as] a prerequisite to an award of damages.") (internal quotations omitted). In light of the above standards and analysis, the Court respectfully recommends that Defendants' Motion be denied as to Plaintiff's First Amendment claim against the District because issues of material fact exist as to

whether the Individual Defendants as Board members voted to terminate McDonald's employment in retaliation for his engagement in constitutionally protected speech.

4. <u>The Individual Defendants Are Entitled to Partial Summary Judgment – Qualified Immunity</u>

Defendants' final argument is that they are entitled to summary judgment as to the claims brought against the Individual Defendants in their official and individual capacities.  In the Section 1983 context, where a plaintiff names both a municipal entity and an official employed by that entity in that person's official capacity, district courts have "consistently dismissed the official capacity claims as redundant."  *Gazzola v. County of Nassau*, No. 16-cv-0909, 2016 WL 6068138, at *4 (E.D.N.Y. Oct. 13, 2016) (citations omitted); *see also Medrano v. Margiotta*, No. 15-cv-3097, 2017 WL 886986, at *5 (E.D.N.Y. Feb. 16, 2017) ("To the extent Plaintiff[] assert[s] claims against the individual defendants in their official capacities, these claims must fail because they are duplicative of the claims asserted by Plaintiffs against [the Town].").  Accordingly, because McDonald brings his Section 1983 claim against both the District and the Individual Defendants in their official capacities, the Court respectfully recommends that this component of Defendants' Motion be granted, and that McDonald's claims be dismissed against the Individual Defendants in their official capacities.

As to the Individual Defendants' individual liability, however, the Court concludes that summary judgment is improper.  Qualified immunity protects federal and state officials sued in their individual capacities from both civil damages and "unnecessary and burdensome discovery or trial proceedings[,]" *Spavone v. New York*

*State Dep't of Corr. Services*, 719 F.3d 127, 134 (2013) (quoting *Crawford-El v. Britton,* 523 U.S. 574, 598, 118 S. Ct. 1584, 1596 (1998)), "where the officials' conduct was not in violation of a 'clearly established' constitutional right." *Sudler v. City of New York,* 689 F.3d 159, 174 (2d Cir. 2012), *cert. denied,* 569 U.S. 1018, 133 S. Ct. 2777 (2013); *see also Walker v. Schult,* 717 F.3d 119, 125 (2d Cir. 2013) ("A federal official is entitled to qualified immunity from suit for money damages unless the plaintiff shows that the official violated a statutory or constitutional right, and that the right was 'clearly established' at the time of the challenged conduct."). More specifically, qualified immunity only extends to circumstances where an official's conduct" does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," and applies "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Spavone,* 719 F.3d at 135 (quoting *Pearson,* 555 U.S. at 231, 129 S. Ct. at 815).

Applying these standards, the Court concludes that the Individual Defendants are not entitled to qualified immunity in their in individual capacities, because the connection between Plaintiff's contact with law enforcement agencies, conveying the Report concerning corruption within the District to Armstrong, and his resulting termination, if established at trial, would violate a clearly established right conferred unto McDonald by the First Amendment. Accordingly, the Court respectfully recommends that Defendants' motion for summary judgment on this alternate basis be denied as to the Individual Defendants in their individual capacities.

30

## B. **Plaintiff's New York Statutory Retaliation Claims**

Further, Defendants seek summary judgment as to Plaintiff's New York state statutory retaliation claims brought under section 75-b of New York's Civil Service Law, and section 3028-d of New York's Education Law.  *See* Compl. ¶¶ 63-79.  In order to state a claim under § 75-b, a plaintiff must allege:  (1) an adverse personnel action; (2) disclosure of information to a governmental body (a) regarding a violation of a law, rule, or regulation that endangers public health or safety, or (b) which she reasonably believes to be true and which she reasonably believes constitutes an improper governmental action; and (3) a causal connection between the disclosure and the adverse personnel action.  *Burns v. Cook*, 458 F. Supp. 2d 29, 44 (N.D.N.Y. 2006).  Similarly, § 3028-d "provides that an employee of a school district shall not be subject to any retaliatory action for making a report, based on a reasonable belief, that a school board has engaged in financial practices that 'violate any local, state, federal law or rule and regulation.'"  *Zehner.*, 666 Fed. App'x at 34 (quoting N.Y. Educ. Law § 3028-d (McKinney 2006)).  As with a claim for First Amendment retaliation, a causal connection can be established by either temporal proximity or retaliatory animus on the part of policymakers.  *See Maher v. Town of Stony Point*, No. 16-cv-607, 2018 WL 4759786, at *11 (S.D.N.Y. Sept. 29, 2018) (applying identical standards of causal connection for both First Amendment retaliation and § 75-b claims, and finding factual issues on both temporal proximity and retaliatory animus preclude summary judgment); *Payson v. Board of Education of Mount Pleasant Cottage School, UFSD*, No. 14-cv-9696, 2017 WL 4221455, at *27 (S.D.N.Y. Sept. 20, 2017) (temporal

31

proximity between protected activity and adverse employment action precludes summary judgment).

Applying these standards, and in light of the conflicting evidence regarding the Individual Defendants' knowledge of Plaintiff's prior engagement in constitutionally protected speech and their vote to terminate his employment in retaliation for that speech, *see* DEs [40-1], [40-2], [42-1], the Court concludes that summary judgment in Defendants' favor as to McDonald's state law whistleblower claims is inappropriate. Accordingly, the Court respectfully recommends that Defendants' Motion be denied as to Plaintiff's New York statutory retaliation claims.

## IV.    CONCLUSION

For the reasons set forth above, the Court respectfully recommends that Defendants' Motion be granted as to McDonald's Section 1983 claim against the Individual Defendants in their official capacities, but denied in all other respects.

## V.    OBJECTIONS

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below.    Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of this report.    Failure to file objections within the specified time waives the right to appeal the District Court's order.    *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a); *Ferrer v. Woliver*, No. 05-cv-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:        Central Islip, New York
              November 7, 2021

                                    /s/ Steven I. Locke
                                    STEVEN I. LOCKE
                                    United States Magistrate Judge